**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**PAM PULFER,**

      **Plaintiff,**

                                **Civil Action 2:11-cv-1125**
     **v.**                            **Judge James L. Graham**
                                 **Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Pam Pulfer, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security   ("Commissioner") denying her application for social security disability insurance benefits.   This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors, the Commissioner's Memorandum in Opposition, Plaintiff's Reply, and the administrative record. (ECF Nos. 8, 11, 12 and 7.)   For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration.

**I. BACKGROUND**

Plaintiff protectively filed her application for benefits on August 22, 2007 alleging that she has been disabled since December 1, 2006, at age 57.   Plaintiff alleges disability as a result of depression, coronary artery disease, diabetes, hypertension, hypothyroidism, dyslipidemia, obesity and costochondritis.   (R. at 121.)   Plaintiff's applications were denied initially and upon reconsideration.   Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").

The ALJ, Amelia G. Lombardo, held a hearing on June 8, 2010, at which Plaintiff, represented by counsel, appeared and testified.   (R. at 34-51.)   A vocational expert also appeared and testified.   (R. at 51-54.)   On April 26, 2011, the ALJ issued a decision finding that Plaintiff was not disabled.   (R. at 9-21.)   The ALJ's decision became final and appealable on October 27, 2011, when the Appeals Council denied Plaintiff's request for review.   (R. at 1-4.) Plaintiff timely appealed.

## II. HEARING TESTIMONY

### A.      Plaintiff's Testimony

Plaintiff testified at the administrative hearing that her previous work experience includes serving as a manager in a low income housing tax credit program for Ohio Housing Finance Agency.   (R. at. 35.)   She later served as compliance director for National Church Residences, a property management company that offers affordable housing.   *Id.*   Finally, she served as a regional director of Edgewood Management, a privately owned management company.   She was laid off from her most recent position due to the company downsizing.   *Id.*

Plaintiff further that testified she is 5'7" tall and weighs 210 pounds.   (R. at 34.)   She stated that she cannot work due to Type II diabetes, coronary artery disease, osteoarthritis, Epstein-Barr syndrome and a thyroid disorder.   (R. at 36.)   She indicated that her osteoarthritis is in her hands and fingers, knees, feet and into her lower back.   (R. at 37.)   Plaintiff also testified that she suffers from chronic urinary tract infections and migraine headaches.   (R. at 37, 39.)

Plaintiff testified that mental impairments also prevent her from being able to work.   She stated that she experiences panic attacks on a daily basis and that she isolates herself in her

bedroom at times.   She further indicated that her panic attacks cause her to break out in a sweat.
(R. at 38.)   Plaintiff testified that she has been treated for depression since she was admitted to
the hospital in 2006.   (R. at 37.)   Dr. Costin provides prescriptions for medication to treat her
depression, but has not increased her medication since her 2006 hospitalization.   (R. at 38.)
Plaintiff stated that she does not believe she could handle the stress of her previous jobs.   (R. at
47.)

Plaintiff estimated that she could walk about two blocks and stand for no more
than five minutes at a time.   (R. at 39-40.)   She stated that her back starts to hurt when she sits,
which usually requires her to elevate her legs.   (R. at 40.)   She testified that she is required to
constantly shift and move in her chair while sitting.   She further indicated that her hands
become tight and ache, and that she has a 10 pound lifting limitation.   *Id.*   She stated that she
does not have the grip or strength to carry objects.   *Id.*

In terms of daily activities, Plaintiff testified that she drives, she tries to attend church
once per week, and she cares for her grandchildren every other week during the summer and
every other weekend during the school year.   (R. at 34, 38.)   Plaintiff stated that she is able to
cook, perform some household chores, go to the store, and take care of her pets.   (R. at 41-42.)
She noted that her son and husband complete most of the household chores because she cannot
lift very much and has to take several breaks.   *Id.*   She estimated that she leaves her house three
times per week to go to church and to attend her grandchildren's sporting events.   (R. at 42.)
She and her husband also sometimes go out to dinner.   (R. at 43.)   Finally, Plaintiff testified
that she visits family at Indian Lake, a resort area, six or seven times per year.   (R. at 43-44.)

**B.      The Vocational Expert's Testimony**

Suman Srinivasan testified as a vocational expert at the administrative hearing.   (R. at 51-54.)   Ms. Srinivasan classified Plaintiff's past work as a compliance director, property manager, and office manager, as all falling within the light range of exertion.   (R. at 52.)   She classified the compliance director and property manger positions as skilled work and the office manager position as semi-skilled.   *Id.*   Ms. Srinivasan then testified that these positions do not involve the performance of any duties that exceed the restriction of light work activity.   *Id.*

On cross examination by Plaintiff's counsel, Ms. Srinivasan testified that an individual would not be capable of performing Plaintiff's prior jobs if the individual were limited to occasional contact with coworkers and supervisors and one to two step tasks.   (R. at 54.)   Ms. Srinivasan also testified that an individual would be unable to perform Plaintiff's prior jobs if he or she were unable to maintain and sustain concentration and could be expected to be off-task a third of the workday.   *Id.*

### IV. THE ADMINISTRATIVE DECISION

On August 26, 2010, the ALJ issued her decision.   (R. at 9-21.)   At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not performed substantially

---

[1]Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.   *See* 20 C.F.R. §404.1520(a)(4).   Although a dispositive finding at any step terminates the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?
2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

gainful activity since December 1, 2006.  The ALJ further determined that Plaintiff had the following severe impairments: coronary artery disease with residuals of stent placement and obesity.  (R. at 11.)

The ALJ concluded that Plaintiff's diabetes mellitus, osteoarthritis, acute bronchitis, Epstein-Barr syndrome, hypothyroidism and depression were not severe impairments.  (R. at 12-13.)  She specifically determined that, based on an analysis of the four broad functional areas known as the "paragraph B" criteria, Plaintiff does not have a severe mental impairment.  (R. at 113-15.)  The ALJ also found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.  (R. at 15.)  At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ found that Plaintiff has the RFC to perform light exertional work.  *Id.*  She concluded that although Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effect of these symptoms were not credible to the extent they were inconsistent with the assigned RFC. (R. at 16.)  In reaching this determination, the ALJ explicitly noted that the opinions of Dr. Costin and Dr. LaTurner are not entitled to controlling, deferential, or even significant weight as to Plaintiff's RFC.  (R. at 20.)  The RFC the ALJ assigned did not include any limitations due to her mental impairments.

Relying on the testimony of Ms. Srinivasan, the ALJ determined that Plaintiff is capable of performing her past relevant work.  (R. at 20-21.)  She therefore concluded that Plaintiff is not disabled within the meaning of the Social Security Act.  (R. at 21.)

**III. MEDICAL RECORDS**

A.     **Physical Impairments**

1.     **Arthur Costin, D.O.**

The record contains treatment notes from Plaintiff's primary care physician, Dr. Costin, from as early as 2001 through December 2009.   On November 21, 2001, Plaintiff visited Dr. Costin with complaints of migraine headaches.   On November 22, 2002, Dr. Costin noted that Plaintiff is hyperglycemic.   (R. at 300.)   In November 2005, Dr. Costin reported that Plaintiff suffers from hypertension, hyperlipidemia, hypothyroidism, and coronary artery disease ("CAD").   (R. at 291.)   In December 2005 Dr. Costin assessed that Plaintiff had "Diabetes mellitus Type II – New onset."   (R. at 290.)   Dr. Costin ordered a stress test for Plaintiff that same month, which revealed results "consistent with myocardial ischemia."   (R. at 190.)

On November 28, 2007, Plaintiff presented to Dr. Costin with complaints of lightheadedness, tingling, and feelings of disorientation.   (R. at 377.)   The following month Plaintiff presented with complaints of chest tightness, shortness of breath, some chest discomfort in the mid-chest region, and coughing.   (R. at 375.)   Dr. Costin diagnosed bronchitis, upper respiratory infection, and "possibly pneumonia."

Dr. Costin saw Plaintiff for the same complaints on January 24, 2008.   (R. at 374.)   He continued his assessment of an upper respiratory infection/bronchitis.   He also diagnosed Plaintiff with a urinary tract infection.   Plaintiff also complained of difficulty sleeping.   Dr. Costin recommended that she take Benadryl to help her sleep.

Plaintiff next visited Dr. Costin on January 30, 2008, complaining that she "feels bad all over."   (R. at 373.)   Although she complained of lumbar discomfort, she stated that it was "improving."   She also reported feeling fatigued.   On examination Plaintiff showed swelling of

6

the right side of her face and her right lip.   Dr. Costin treated her with Vitamin B and medications.

Less than a week later, on February 5, 2008, Plaintiff presented to Dr. Costin with complaints of aching and fatigue.   She also reported feeling dizzy and experiencing symptoms of a urinary tract infection.   (R. at 372.)   Dr. Costin diagnosed Plaintiff with Epstein Barr virus. Dr. Costin administered a vitamin B shot during that visit as well.   Plaintiff received additional Vitamin B shots throughout 2008.   (R. at 370-71, 547-49, 552.)

On March 13, 2008, Plaintiff complained of aches in her body, muscles and joints.   (R. at 371.)   She stated that she has not felt well throughout most of the winter.   She continued to have a urinary tract infection.   Dr. Costin prescribed Levaquin and Fioricet.

Plaintiff next saw Dr. Costin in December 2008 with complaints of chest pain.   (R. at 546.)   She presented with the same complaints in January 2009.   (R. at 545.)   In February 2009, Plaintiff presented with complaints of shortness of breath and fatigue.   (R. at 544.)

On February 17, 2009, Dr. Costin completed a physical residual functional capacity form. (R. at 507-21.)   He opined that as a consequence of osteoarthritis, costochondritis and depression, Plaintiff was unable to perform any work, including sedentary work, on a sustained basis.   (R. at 511.)   Dr. Costin also indicated that Plaintiff's mental disability inhibited her social life and work life.   (R. at 510.)

That same day, Dr. Costin also completed a set of interrogatories, in which he indicated that the combined effect of Plaintiff's physical and medical conditions was greater than the sum of the parts.   (R. at 513.)   Specifically, Dr. Costin stated that Plaintiff's mental condition affects her physical condition and vice versa.   (R. at 514.)   He indicated that, "due to multiple

illnesses" including depression, Plaintiff was unable to manage normal work-place conditions or succeed in the workplace.   (R. at 513-520.)

On February 25, 2009, Dr. Costin referred Plaintiff to a psychologist.   (R. at 543.)   On March 17, 2009, he saw Plaintiff again for complaints of chest pain, shortness of breath, dizziness, headache, chest congestion, and left earache.   (R. at 542.)   On April 7, 2009, Dr. Costin noted that Plaintiff was in cardiac rehabilitation.   (R. at 541.)   Plaintiff presented the following month for tachycardia (a heart rate that exceeds the normal range).

On June 9, 2009, Plaintiff again presented with complaints of chest pain.   Dr. Costin directed Plaintiff to report to the emergency room at Mary Rutan Hospital.   (R. at 597-99.) Plaintiff complained of illness lasting approximately one week, accompanied by sore throat, earache, and right side chest pain.   (R. at 597.)   Plaintiff rated the chest pain at a 7 on an analog pain scale and indicated that the pain radiated into her neck through her right arm, and into her jaw.   Plaintiff also reported shortness of breath.   Upon examination, Plaintiff's heart appeared normal.   (R. at 598.)   An x-ray of Plaintiff's chest was normal.   (R. at 555.)   Dr. Costin's impression was chest pain on the right side and acute bronchitis.   (R. at 599.)   Another doctor also examined Plaintiff in the hospital and noted no abnormalities in Plaintiff's heart.   (R. at 602.)   The doctor noted that, according to Plaintiff's records, she has coronary artery disease.

Plaintiff saw Dr. Costin again on July 7, 2009 for complaints of "dull chest pain, constant, even sore to touch."   (R. at 621.)   Plaintiff reported breathing difficulties, swollen glands and right ear pain.   Dr. Costin ordered a CT scan of Plaintiff's upper abdomen.   The results were normal.   (R. at 553.)

On July 15, 2009, Plaintiff still complained of tenderness in her right gland and right ear discomfort.  (R. at 20.)  In September 2009 she reported the same symptoms, as well as difficulty breathing, sinus drainage and chest congestion.  (R. at 619.)  The following month, Dr. Costin treated Plaintiff for migraine headaches.  (R. at 618.)

On December 23, 2009, Dr. Costin provided a narrative report for Plaintiff's Social Security Disability claim.  (R. at 642.)  Dr. Costin reported knowing Plaintiff very well as a result of having treated her for over twenty (20) years.   He indicated that her major diagnoses included coronary artery disease, hypothyroid, diabetes mellitus type 2, osteoarthritis of multiple joints, and hyperlipidemia.   He reported that Plaintiff had undergone an angioplasty and had heart stents placed in 1998, 2007, and March 2009.   She has right-sided heart disease.   Dr. Costin also reported that Plaintiff suffers from hypothyroidism, for which she takes medication. In an attempt to manage her diabetes, Dr. Costin noted that Plaintiff is on a restricted diet and multiple medications.   Dr. Costin characterized Plaintiff's osteoarthritis as "moderate to severe."   He indicated that she has multiple problems with multiple joints, including her ankles, knees and hips, as well as her lumbar spine and upper extremities, including her elbows, wrists and hands.   He concluded by stating that Plaintiff is "restricted in her activities and has difficulty performing work-related functions due to physical restraints of osteoarthritis of multiple joints."   (R. at 643.)

### 2.      Howard Kander, M.D.

Dr. Kander first treated Plaintiff on May 24, 2007 at Riverside Methodist Hospital.   (R. at 243.)   Plaintiff was transferred to Riverside after she presented to the emergency room at

Mary Rutan Hospital with complaints of chest pain.   (R. at 212.)   A chest x-ray revealed that Plaintiff's chest was stable with no acute infiltrates or effusions.   (R. at 217.)   An EKG yielded nonspecific T wave abnormality.   (R. at 218-215.)

While Plaintiff was at Riverside, Dr. Kander performed a heart catheter procedure, which revealed significant lesions on her right coronary artery.   A chest x-ray demonstrated no evidence of active cardiopulmonary disease.   (R. at 250.)   Plaintiff tolerated the procedure well, and was discharged the following day.

Plaintiff saw Shirlien Metersky, R.N. in Dr. Kander's office for a follow-up appointment on June 28, 2007.   (R. at 268.)   Plaintiff denied any cardiac complaints since her heart catheterization.   Plaintiff reported that she had begun cardiac rehabilitation.   Upon examination, Plaintiff weighed 240 pounds with a BMI of 37, which classified her as obese Class II.   An EKG revealed no problem with Plaintiff's sinus rhythm, although the results recorded some cardiac abnormalities.   (R. at 269.)

Plaintiff visited Dr. Kander on August 25, 2008.   (R. at 503.)   Dr. Kander noted that Plaintiff's symptoms of chest discomfort had returned.   He reported that palpation seems to worsen Plaintiff's symptoms, which suggests costochondritis.   Plaintiff's EKG results were abnormal, which prevented Dr. Kander from ruling out ischemia.   Dr. Kander planned to perform a repeat catheterization.

Dr. Kander performed a catheterization on Plaintiff on August 28, 2008.   (R. at 502.) The procedure yielded an "excellent angiographic result with no residual stenosis."   Dr. Kander expressed hope that the procedure would provide Plaintiff long-term relief.

10

Plaintiff was re-admitted to the hospital with symptoms of chest pain on September 4, 2008.  (R. at 501.)  Dr. Kander reported, "I do not see a cardiac cause for her symptoms."

Diane Johnston, C.N.P. examined Plaintiff on September 12, 2008.  (R. at 499.) Plaintiff reported "she is really feeling very well."   She stated that she has no chest discomfort, and that her shortness of breath and fatigue had improved.   Ms. Johnston noted that Plaintiff's coronary disease was stable.

Plaintiff presented to the emergency room again on March 7, 2009 with complaints of chest pain.  (R. at 526-33.)  A chest x-ray revealed no abnormalities.  (R. at 590.)  Dr. Kander performed a diagnostic heart catheter.  (R. at 533.)   He reported "at this stage I do not see a cardiac cause for her symptoms. . . . I am hopeful a correctable cause can be found but clearly, it is not ischemic."

Plaintiff presented to Dr. Kander on October 7, 2009 with difficulty breathing.  (R. at 622, 624-26.)   On examination Dr. Kander noted no abnormalities and determined that Plaintiff's symptoms were most likely non-ischemic in nature.   He reported that Plaintiff's coronary artery disease is "stable status post angioplasty," that her hyper-cholesterolemia was "stable," and that her hypertension was "benign" and "stable."  (R. at 624.)   Dr. Kander noted "I do not see any active cardiac issues."   (R. at 622.)

On March 16, 2010, Plaintiff presented to Riverside Hospital with complaints of chest pain.  (R. at 717.)   Dr. Kander performed a heart catheter.  (R. at 781.)   Dr. Kander noted normal ventricular function and valve function.   His post-operative diagnosis was "coronary artery disease (not causing symptoms)."   Plaintiff was discharged following the procedure.  (R. at 785.)

### 3.    Cindi Hill, M.D.

On November 9, 2007, state agency reviewing physician Dr. Hill opined that Plaintiff could perform medium work activity with frequent stair climbing and occasional ladder climbing.   She noted that Plaintiff's "[c]ostochondritis doesn't last."   (R. at 338.)

### 4.    Walter Holbrook, M.D.

In January 2008, state agency reviewing physician Dr. Holbrook opined that Plaintiff could lift or carry up to fifty pounds and frequently lift or carry up to twenty-five pounds.   (R. at 362.)   Dr. Holbrook further opined that Plaintiff could stand or walk for six hours and sit for six hours out of an eight-hour work day.   Plaintiff had an unlimited ability to push and pull.   She could frequently climb stairs and only occasionally climb ladders, ropes, or scaffolds.   In June 2008, state agency physician Dr. James Gahman reviewed and affirmed Dr. Holbrook's assessment.   (R. at 382.)

### 5.    Mary Rutan Hospital

Plaintiff presented to the emergency room on July 19, 2008 with complaints of a migraine headache.   (R. at 383-93.)   She reported that she had the migraine for two days.   (R. at 387.)   A CT scan of Plaintiff's head revealed no abnormalities.   (R. at 393.)   The attending physician administered medication and discharged Plaintiff once her condition improved.   (R. at 389.)

Plaintiff presented to the emergency room on August 24, 2008 with complaints of chest pain.   (R. at 398, 421.)   A chest x-ray revealed "asymmetric elevation of the right hemidiaphragm which has been present since 2007."   (R. at 418.)   The radiologist reported, "I

see no acute infiltrates or effusions at this time."   The cardiac silhouette appears stable.

Plaintiff was transferred to Riverside.   (R. at 419.)

Plaintiff again presented to the emergency room on July 9, 2009 complaining of chest

pain.   (R. at 616.)   A chest x-ray yielded normal results.   Plaintiff presented the emergency

room on November 5, 2009 for shortness of breath.   (R. at 693-41.)   A pulmonary study

revealed a "mild restriction; no obstruction and normal diffusion."   (R. at 640-41.)

### 6.      Rodney C. Graber, M.D.

Dr. Rodney Graber performed Plaintiff's December 12, 2005 stress test at the direction of

Dr. Costin.   (R. at 190.)   The record also contains a March 25, 2009 letter from Dr. Graber to

Plaintiff's counsel.   (R. at 522.)   Dr. Graber indicated in the letter that he had not examined

Plaintiff in his office since 2002.   He reviewed Plaintiff's medical records and reported that,

"[n]onetheless, she indeed does have coronary artery disease and has had previous coronary

artery interventions in the past."   *Id.*   He further reported that Plaintiff has diabetes,

hyperlipidemia, hypertension and gastroesophageal reflux disease.   According to Dr. Graber,

Plaintiff's records indicate that she "should have been capable of carrying out light physical

activity based on the VO2 metabolic information."   *Id.*

### B.      Mental Impairments

### 1.      Riverside Methodist Hospital

On December 7, 2006, Plaintiff, at the insistence of family, presented to the emergency

room at Riverside Hospital for depression.   (R. at 193.)   Plaintiff's family reported that she had

been reclusive and in her bedroom for the previous three to four weeks.   They also reported a

family history of suicide.   Plaintiff denied any suicidal or homicidal ideation.   She denied any

13

recent illness.   Medical professionals reported that Plaintiff was "very reserved," and that she displayed no obvious spontaneous crying or other depressive symptoms on admission.   Plaintiff was admitted for acute depression.

Upon examination, Plaintiff reported that she had been depressed for a year but that it had worsened in recent weeks.   She reported isolating herself in her bedroom.   Her symptoms included crying episodes, depressed mood, diminished ability to feel pleasure, diminished energy, diminished interest in being with others, feelings of physical heaviness, less satisfying social interactions, and social withdraw.   (R. at 196.)   Medical staff recommended that Plaintiff see a therapist and a psychiatrist for medication management.

The following day, upon examination Plaintiff stated, "Just adjust my medications and let me go."   (R. at 208.)   She demonstrated a pathological mood, affect, judgment, and cooperation.   She reported that her depression was escalated by martial struggle.   Plaintiff was diagnosed with depression and assigned a GAF score of 50.[2]

### 2. Consolidated Care, Inc.

In response to an inquiry related to Plaintiff's claim for benefits, on October 3, 2007 Danielle Hayes, P.C. provided a letter relating to Plaintiff's mental status.   Ms. Hayes indicated that Plaintiff was assessed on January 4, 2007 and diagnosed with major depressive disorder, recurrent, and moderate severity.   (R. at 337.)   Professionals at Consolidated Care provided

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.   Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.   A GAF score of 41-50 is indicative of "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning." *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

Plaintiff with treatment goals to decrease her depressive symptoms and learn new coping skills. These goals included attending counseling two times per month and meeting with a doctor to manage medications.   Although Plaintiff attended two therapy sessions in January 2007, Ms. Hayes reported that she failed to keep her subsequent appointment and denied further services.

### 3.    James Tanley, Ph.D.

Consulting psychologist Dr. Tanely conducted a clinical interview of Plaintiff on December 18, 2007.   (R. at 339.)   Dr. Tanley reported that Plaintiff appeared motivated and did not appear to exaggerate or minimize her symptoms.   (R. at 340.)   Plaintiff reported that she felt depressed over her health, and indicated that she had been experiencing sleep disturbances with unintentional weight loss, as well as mood problems and an inability to experience pleasure. Dr. Tanley diagnosed Plaintiff with an adjustment disorder with depressed mood, and assigned Plaintiff a GAF score of 60.[3]   He concluded that Plaintiff's ability to relate to others was not limited, noting that she was cordial and cooperative.   He further concluded that Plaintiff experienced no limitation in her ability to understand and follow simple instructions, or her ability maintain attention to perform simple and repetitive tasks.   Dr. Tanley opined that Plaintiff was moderately impaired in her ability to deal with the stress and pressure of work activity.   (R. at 339-41.)

### 4.    Joan Williams, Ph.D./Tasneem Khan, Ed.D.

---

[3]A GAF score of 51-60 is indicative of "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).

On January 1, 2008, state agency psychologist Dr. Williams completed a psychiatric review technique based on a review of Plaintiff's medical records.   (R. at 343-56.)   Dr. Williams opined that Plaintiff had mild limitations in activities of daily living and in maintaining concentration, persistence, or pace, and moderate limitations in maintaining social functioning. (R. at 353.)   Dr. Williams also determined that Plaintiff had experienced one or two episodes of decompensation of extended duration.   (R. at 353.)   Dr. Williams completed a Mental Residual Functional Capacity Assessment, wherein she concluded that Plaintiff was moderately limited in her abilities to work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; and respond appropriately to changes in the work setting.   (R. at 357-58.)   Dr. Williams further concluded that Plaintiff had mild to moderate limitations, and that the evidence "supports intact capacity for simple to moderately complex tasks in a relatively static work environment."   (R. at 359.)   In May 2008, Dr. Khan reviewed Plaintiff's medical records and affirmed Dr. Williams' assessment.   (R. at 381.)

### 5.    Arthur Costin, D.O.

Dr. Costin managed Plaintiff's medication for her depression.   In October 2006, for example, he changed her medication from Paxil to Effexor because Plaintiff had been experiencing fatigue.   (R. at 282.)   Dr. Costin saw Plaintiff in December 2006 after her hospitalization for depression.   (R. at 282.)   Plaintiff reported that she had been sleeping a lot and that she wished to see a psychologist.   Dr. Costin resumed prescribing Paxil.

On January 3, 2007, Plaintiff reported feeling better, but indicated that she experienced anxiety in crowds and closed spaces.   (R. at 281.)   Dr. Costin noted that Plaintiff was slightly

tearful.   He increased her dose of Paxil and recommended that she see a psychologist in April 2007.  (R. at 281.)

Dr. Costin completed interrogatories as to Plaintiff's mental impairments in February 2009.  (R. at 512-21.)   He opined that Plaintiff's mental impairments affected her physical impairments and her physical impairments affected her mental impairments.   He noted that Plaintiff "has been stoic with her many disease processes topped [with] mental depression." (R. at 514.)   He further opined that Plaintiff could not be prompt and regular in attendance, nor could she respond appropriately to supervision, co-workers and customary work pressures due to her multiple illnesses.  (R. at 514-15.)   He reported that the normal pressures of work would cause Plaintiff's illnesses to worsen which would impact her depression.  (R. at 516.)   Because of her depression, Plaintiff could not understand, remember, or carry out simple work instructions.   Dr. Costin further concluded that, because Plaintiff was not emotionally stable to begin with, a work environment would worsen her condition.   (R. at 517.)   According to Dr. Costin, Plaintiff was markedly restricted in her daily activities, social functioning; and experienced marked deficiency in concentration, persistence, or pace.   (R. at 520-21.)

**6.    Aaron LaTurner, Ph.D.**

Plaintiff had her initial session with Dr. LaTurner on March 4, 2009.   (R. at 525.) Plaintiff reported that depression and suicide run in her family.   She complained of depressed moods, crying spells, and temper problems as well as feelings of worthlessness, hopelessness, and helplessness. Plaintiff further indicated that she had been experiencing problems sleeping, and that she did not care if she died.   She had been isolating herself in her bedroom.   Dr.

17

LaTurner diagnosed Plaintiff with depressive disorder not otherwise specified, and anxiety disorder not otherwise specified.   (R. at 525.)

On March 25, 2009, Plaintiff reported to Dr. LaTurner that she had been doing "okay." (R. at 524.)   She stated that she continues to isolate herself and avoid social contact.   She further reported that she becomes overwhelmed and does not tolerate stress well; and that when she does become upset she isolates herself in her bedroom.   Dr. LaTurner noted that Plaintiff's profile substantiates concerns with depression and anxiety as well as possible somatic disorder.

On April 14, 2009 Plaintiff reported to Dr. LaTurner that her mood had been okay.   (R. at 524.)   She stated that she was tired and sore from going through cardiac rehabilitation for the past couple of weeks.

Plaintiff saw Dr. LaTurner again on April 28, 2009.   (R. at 523.)   Plaintiff reported that she had been experiencing health issues, and that her pain that day was a 5 on an analog pain scale.   Plaintiff reported experiencing panic symptoms in church, during which times she would become extremely sweaty, her chest becomes tight, her head throbs, and her heart rate increases. She stated that she avoids crowds.   She also stated that she is able to shop at her local grocery store because not many people are there, but when she goes to more crowded stores her panic symptoms ensue.

On May 13, 2009, Plaintiff reported that "not much has changed."   (R. at 560.)   On June 3, 2009 Plaintiff presented with a fair mood and reports of not doing so well with her depression. *Id.*   On June 24, 2009 Plaintiff presented with a fair mood, and indicated that she had been feeling better physically which has helped her psychologically.   *Id.*   Plaintiff again presented

with a fair mood on August 19, 2009.   Plaintiff reported that she had been "coping," but that she avoids most social situations due to anxiety.

On August 24, 2009, Dr. LaTurner completed a functional capacity assessment.   (R. at 561-63.)   Dr. LaTurner reported that the results of an MMPI-II test demonstrated that Plaintiff had poor to no ability to relate to co-workers, deal with the public, or deal with work stress.   She also stated that Plaintiff had poor to no ability to understand, remember, and carryout detailed job instructions, and to relate predictably in social situations.

Also on August 24, 2009, Dr. LaTurner completed a set of interrogatories regarding Plaintiff's mental impairments.   (R. at 564-73.)   She indicated that he had treated Plaintiff for a total of nine one-hour sessions.   (R. at 564.)   Her impairments included anxiety and depression. Dr. LaTurner reported that the combination of Plaintiff's physical and mental impairments were greater than the sum of the parts.   (R. at 565.)   He stated, "[s]tress/anxiety impact heart condition, higher BP & chronic pain [], fears related to heart problems exacerbate depression & anxiety."   (R. at 566.)   He opined that among sixteen areas of workplace functioning, Plaintiff could perform adequately in only one area: accept instructions and respond appropriately to criticism from supervisors.   (R. at 567-72.)   Dr. LaTurner concluded that Plaintiff was moderately restricted in activities of daily living and maintaining concentration, persistence, or pace; and that she was markedly limited in maintaining social functioning.   (R. at 572-73.)

Plaintiff saw Dr. LaTurner on September 15, 2009.   (R. at 645.)   Dr. LaTurner noted that Plaintiff's mood was "fair."   Plaintiff reported feeling depressed the last couple of weeks due to illness.   She felt anger toward her father as the anniversary of his suicide approached.

19

On October 14, 2009, Dr. LaTurner reported that Plaintiff's mood was "fair" and her affect was appropriate.  *Id.*  She reported feeling "ups and downs" the past few weeks.   On November 11, 2009, Plaintiff completed the Beck Depression Inventory-II ("BDI-II") and Beck Anxiety Inventory ("BAI").  *Id.*  She scored a 32 on the BDI-II indicating a "severe" level of depressive symptoms.   The test revealed no signs of suicidal ideation, plans or intention. Plaintiff scored a 45 on the BAI indicating a significant level of anxiety symptoms.

Plaintiff saw Dr. LaTurner again on December 16, 2009.   (R. at 644.)   Dr. Laturner reported Plaintiff's mood as "fair," with appropriate affect.   Plaintiff reported that she continues to experience "ups and downs."   Dr. LaTurner planned to continue to focus on cognitive behavioral, interpersonal and supportive therapies.

On January 13, 2010 Dr. LaTurner reported that Plaintiff's mood was "downcast."   (R. at 644.)   Plaintiff stated that she "made it through the holidays."   She stated that she lost two friends during the holiday season, and the anniversaries of her parents' deaths were both in January.

The record indicates that Plaintiff cancelled her February 10, 2010 appointment with Dr. LaTurner, as well as her March 3, 2010 appointment.   *Id.*

## V. STANDARD OF REVIEW

Upon review of a case appealing the decision of the Commissioner, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if

20

supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Services*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. LEGAL ANALYSIS

Plaintiff contends that the ALJ committed reversible error in (1) concluding that Plaintiff does not have a severe mental impairment; (2) rejecting the opinions of Plaintiff's treating physicians; and (3) assessing Plaintiff's credibility. Because the Undersigned concludes that the

ALJ's non-disability determination is not supported by substantial evidence, an in-depth analysis

of Plaintiff's individual statements of error is unnecessary.  *See Walters v. Comm'r*, 127 F.3d

525, 528 (6th Cir. 1997) ("[A] court must affirm the Commissioner's conclusions absent a

determination that the Commissioner . . . has made findings of fact unsupported by substantial

evidence in the record.").   Specifically, substantial evidence does not support the ALJ's RFC

assessment because it does not include any limitation with respect to Plaintiff's mental

impairments.[4]

As a threshold matter, the Undersigned notes that an ALJ's failure to find an impairment

to be "severe" will not constitute reversible error so long as the ALJ finds at least one other

impairment to be severe and considers in her RFC analysis the limitations caused by both the

severe and non-severe impairments.   The United States Court of Appeals for the Sixth Circuit

has described step two of the sequential process as follows:

> At step two, an ALJ must evaluate the claimant's "symptoms, signs, and
> laboratory findings" to determine whether the claimant has a "medically
> determinable mental impairment(s)."   [20 C.F.R. §§ 404.1520a(a) and
> 404.1520a(b)(1)].   If the claimant has a medically determinable mental
> impairment, the ALJ "must then rate the degree of functional limitation resulting
> from the impairment(s)" with respect to "four broad functional areas":
> "[a]ctivities of daily living; social functioning; concentration, persistence, or
> pace; and episodes of decompensation."  *Id*. at §§ 404.1520a(b)(2), (c)(3). These
> four functional areas are commonly known as the "B criteria."   *See* 20 C.F.R. pt.
> 404, subpt. P, app. 1, § 12.00 *et seq.*; *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir.
> 2008).   The degree of limitation in the first three functional areas is rated using
> the following five-point scale: none, mild, moderate, marked, and extreme.   20
> C.F.R. § 404.1520a(c)(4).   The degree of limitation in the fourth functional area
> (episodes of decompensation) is rated using the following four-point scale: none,
> one or two, three, four or more.   *Id*.   If the ALJ rates the first three functional

---

[4]Plaintiff challenges the ALJ's finding that her mental impairments are not "severe," and the
ALJ's rejection of the medical evidence demonstrating that her mental impairments limit her
ability to work.   (Statement of Errors 11, 16, ECF No. 8.)   Implicit in both of these assignments
of error is Plaintiff's objection to the ALJ's failure to incorporate into the RFC limitations
imposed by her mental impairments.

areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* at § 404.1520a(d)(1).  Otherwise, the impairment is considered severe and the ALJ will proceed to step three.  *See id.* § 404.1520a(d)(2).

*Rabbers*, 582 F.3d at 652–53.   Thus, if no signs or laboratory findings substantiate the existence of an impairment, it is appropriate to terminate the disability analysis.  *See* SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996) ("In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920 . . . .").

Where the ALJ determines that a claimant has a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."  *Pompa v. Comm'r of Soc. Sec.*, Fed. App'x 801, 803, (6th Cir. 2003).   Rather, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] [RFC]."   20 C.F.R. § 404.1545(e); *Pompa*, 73 Fed. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (finding no error where the ALJ found at least one severe impairment and where he considered all of the plaintiff's impairments in the RFC assessment).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.*, 342 Fed.

23

App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09-CV-000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted). "ALJs are not mental health experts." *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823 (N.D. Ohio 2009) (citing *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995)). "As a result, an ALJ cannot substitute her own lay opinion for that of a medical expert." *Id.*

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

In this case, every mental health professional that evaluated Plaintiff or reviewed her

24

records determined that she has at least some limitation as a result of her mental impairments. Dr. Tanley evaluated Plaintiff on December 18, 2007 at the request of the Bureau of Disability Determination.   (R. at 339-41.)   He diagnosed Plaintiff with an adjustment disorder with depressed mood, chronic.   (R. at 341.)   Dr. Tanley determined that Plaintiff's mental condition moderately impairs her ability to withstand the stress and pressure of daily work.   *Id.*   Another mental health professional, Dr. Williams, reviewed Plaintiff's records on January 1, 2008.   (R. at 343-56.)   She also found that Plaintiff suffers from an adjustment disorder with depressed mood.   (R. at 346.)   Dr. Williams concluded that Plaintiff's mental condition causes mild to moderate limitations in her functional capacity.   (R. at 359.)   Dr. Williams further opined that, given these limitations, Plaintiff has the "capacity for simple to moderately complex tasks in a relatively static work environment."   *Id.*   Dr. Khan subsequently reviewed Plaintiff's medical records and affirmed Dr. Williams' assessment.   (R. at 381.)   Finally, Plaintiff's treating mental health professional, Dr. LaTurner, concluded that Plaintiff's mental condition causes moderate to marked limitations in her functional capacity.   (R. at 564-73.)

Despite these four separate determinations from mental health professionals that Plaintiff's mental condition limits her functional capacity, the ALJ's RFC assessment incorporates no mental limitation whatsoever.   (R. at 15.)   The ALJ's RFC assessment is that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b)."[5]   *Id.*

---

[5]The Regulations define light work as:

> [I]nvolv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and

The ALJ's reasons for excluding a mental limitation from her RFC finding are not supported by substantial evidence.   The ALJ rejected each of the mental health professionals' opinions as follows:

> The claimant alleged that she suffers from daily panic attacks and reported to Dr. Turner that she isolates herself and does not go out.   However, as set forth above, she is able to shop, she goes to her brother's house to swim, attends church every week, takes care of her grandchildren and attends their ballgames, drives, and socializes with family at Indian Lake frequently.   She reported experiencing panic attacks around crowds of people, but also reported going out to eat with her husband and shopping, which is inconsistent with that allegation.   She reported significant depressive and anxiety symptoms resulting in a nervous breakdown in December of 2006, but discontinued counseling on her own after only two sessions and did not return to any type of formal mental health treatment until March of 2009.   Further, the frequency of this therapy is not consistent with the severity alleged by the claimant. The claimant receives anti-depressant medication from her family physician, but the medication and dose had not changed in many years, which is not consistent with reportedly escalating symptoms of functional impairment. . . . Further, her initial testimony is also inconsistent with her report to Dr. Tanley.   In June 2009 the claimant reported that her alleged depression and anxiety were under control (Exhibit 33-F at 6).
>
> . . .
>
> [I]t is noted that Dr. Tanley reported the claimant was moderately limited in her ability to tolerate the stress and pressure associated with day-to-day work activity and that the State Agency reviewing psychologist reported that the claimant experienced moderate difficulties in her ability to maintain concentration, persistence, or pace.   A review of Dr. Tanley's examination reveals no findings that support more than a mild degree of impairment in stress tolerance.   The claimant was alert and oriented, exhibited intact memory and recall, and did not exhibit autonomic or motoric signs of anxiety or depression. Thoughts were coherent, relevant, and goal-directed, her affect was appropriate to thought content, and psychomotor activity was within normal limits with no allegations of guilt, hopelessness, helplessness, or worthlessness.   Energy level was also adequate and there was no evidence of apprehension, vigilance, scanning, fear, or

---

pulling of arm or leg controls.   To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.   If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 CFR § 404.1567(b).

sense of impending doom.  These essentially normal findings are not consistent
with a finding of moderate difficulty tolerating stress.  Further, the State Agency
psychologist's opinion is based on those essentially normal findings and one brief
hospital visit, after which the claimant failed to continue follow up therapy
because she felt it was not beneficial.  Accordingly, based on the essentially
normal mental status findings by Dr. Tanley, the lack of formal mental health
treatment beyond two counseling sessions, and the fact that medication prescribed
by her family physician has not changed in any manner that would reflect
increasing or changing symptoms, it is not reasonable to find that the claimant
suffers from more than a mild functional impairment secondary to her alleged
mental impairment.

. . .

In sum, the above residual functional capacity assessment is supported by the
weight of the objective and clinical findings of record, including the claimant's
documented daily activities, which support the conclusion that the claimant
retains the residual functional capacity to perform light work activity.

(R. at 17-18, 20.)  Accordingly, the ALJ offered the following three reasons for excluding a

mental limitation from her RFC assessment: the Plaintiff's daily activities are not reflective of a

mental limitation; the Plaintiff's treating physician did not alter her course of treatment; and Dr.

Tanley's medical opinion is inconsistent with his observations.   Not only are none of these

reasons supported by substantial evidence, but each represents the ALJ's impermissible

substitution of her own judgment for that of the mental health professionals.  *Winning*, 661 F.

Supp. 2d at 824.

     First, every mental health professional who examined Plaintiff took into account her

daily activities and nevertheless concluded that Plaintiff's mental condition poses at least some

limitation.   Dr. Tanley considered the fact that Plaintiff watches her grandchild sometimes.   (R.

at 340.)   He also noted that she does household chores.  *Id.*  Dr. Williams reported that

Plaintiff "does household chores, makes meals, occasionally watches her grandson, takes care of

pets, drives, shops, watches [television], occasionally goes to church [and] attends grandchild's

27

sporting events."  (R. at 355.)  Dr. Kahn likewise noted that Plaintiff "is able to drive, shop,

attend church, attend grandchildren's sporting events, and prepare simple meals."  (R. at 381.)

Dr. LaTurner also noted that Plaintiff goes grocery shopping.  (R. at 523.)  Still, each of these

professionals determined that Plaintiff is limited in her functional capacity due to her mental

condition.   The ALJ erred in relying on her own assessment of the significance of Plaintiff's

daily activities rather than deferring to the conclusions of the mental health professionals.

*Simpson*, 344 Fed. App'x at 194.

        The ALJ also erred in failing to consider Dr. LaTurner's assessment in her RFC analysis

on the grounds that she disagrees with Dr. LaTurner's course of treatment.   The ALJ opined that

if Plaintiff "were truly experiencing the degree of emotional distress and functional limitation

asserted by Dr. LaTurner, [] a recommendation for formal psychiatric evaluation or at least an

increase in medication or counseling sessions would be appropriate."  (R. at 20.)  The ALJ's

conclusion, however, contradicts the determination of all four of the mental health professionals

that offered an opinion in this case.   Each of those professionals determined from their

evaluations and review of the record, including their assessment of Plaintiff's treatment, that

Plaintiff is limited in her functional capacity.   The ALJ "must not succumb to the temptation to

play doctor and make [her] own independent medical findings."   *Simpson*, 344 Fed. App'x at

194.

        The ALJ's failure to consider in her RFC assessment the findings of Drs. Tanley,

Williams and Kahn suffers the same fatal flaw.   The ALJ indicated that "although Dr. Tanley

and the State Agency psychologist[s] reported that the claimant was moderately impaired in

[concentration, persistence or pace], a review of the clinical observations contained in Dr.

Tanley's report and Dr. LaTurner's records do not support a finding that the claimant experiences more than mild difficulties in this area."   (R. at 14.)   Again, the ALJ is not a mental health expert.   *Wilder*, 64 F.3d at 337.   The ALJ's overt substitution of her own judgment for that of the mental health professionals does not constitute substantial evidence to support her RFC assessment.   *Isaacs*, 2009 WL 3672060, at *10 ("[The] ALJ may not interpret raw medical data in functional terms.")

Accordingly, the ALJ relied on nothing more than her own judgment to reject the conclusions of four mental health professionals that Plaintiff's mental health condition imposes functional limitations.   Thus, the ALJ's RFC assessment is not supported by substantial evidence.   The decision of the Commissioner must therefore be reversed.[6]

## VII. CONCLUSION

In light of the error outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, the Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

---

[6]To be clear, the Undersigned expresses no opinion as to the ultimate issue of whether Plaintiff is disabled within the meaning of the Social Security Act.   Rather, the conclusions set forth herein

Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 15, 2013                     /s/ *Elizabeth A. Preston Deavers*
                                            Elizabeth A. Preston Deavers
                                            United States Magistrate Judge

---

relate only to the ALJ's failure to appropriately assess Plaintiff's RFC.